UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

F T C ENERGY LTD INC

VERSUS

AETHON ENERGY OPERATING, LLC

CIVIL ACTION NO. 22-cv-2243

MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

**Introduction**

FTC Energy Ltd., LLC ("FTC") filed suit in state court against Aethon Energy Operating, LLC ("Aethon") based on claims that Aethon did not comply with the requirements of the Well Cost Reporting Statute (La. R.S. 30:103.1 and 103.2), which resulted in Aethon forfeiting its right to deduct certain costs from FTC's share of production from several wells in Bossier Parish. Aethon removed the case based on diversity jurisdiction, the parties consented to have the proceedings decided by the undersigned magistrate judge, and the case was referred pursuant to 28 U.S.C. § 636(c).

Aethon attacked the claims in two motions for partial summary judgment, with one motion directed to what the parties call the Skannal Wells and the other motion directed to what they call the Hodges Wells. One of Aethon's arguments with respect to the Hodges Wells is that FTC has no mineral rights in that area because FTC's mineral title relied on a 2012 acknowledgment of a servitude that did not, as a matter of law, interrupt the prescription of nonuse with respect to FTC.

FTC filed opposition to the Aethon motions. It also filed its own Motion for Partial Summary Judgment on Acknowledgment (Doc. 33) that seeks a holding that the 2012 acknowledgment did interrupt prescription and preserve FTC's mineral interests. The court has elected to address the acknowledgment issue presented by FTC's motion before proceeding to Aethon's motions. For the reasons that follow, FTC's motion will be granted.

**Relevant Facts**

The property at issue is located in Section 25, Township 17 North, Range 12 West in Bossier Parish. It is within one of the oldest oil and gas fields in Louisiana, with mineral operations dating back over 100 years. The title history is lengthy and complex, but the court will attempt to summarize the relevant history, as taken from the title opinions filed by the parties.

The short version is that Abel C. Skannal Sr. and his wife owned land and mineral rights in Section 25 until their deaths in 1946 and 1951. Their five children inherited the property in equal proportions of 20% each. One of those five children was Charlie F. Skannal, who is the father of Welcome Skannal Fawcett, and the grandfather of Welcome's son, David Fawcett. David Fawcett sold his Section 25 mineral rights to FTC in 2020. Those mineral rights depend on the validity of two servitudes created in 1953 and 1968. Aethon argues that the servitudes expired by prescription of nonuse in 2014, but FTC contends that a 2012 acknowledgment by the landowner interrupted that prescription and kept the servitudes alive.

Now for a slightly longer version. In 1953, after the five Skannal siblings inherited the property, four of the five executed a cash sale deed of their 4/5 interest in the Section 25 property to the fifth sibling, Albert Cunyus Skannal, Jr. The sellers reserved their entire interest in the minerals in then producing properties and an undivided half-interest in the minerals owned by them in non-producing properties. That reservation created a mineral servitude, referred to as the 1953 Servitude, which covers certain undivided interests in minerals within Section 25.

In 1968, members of the Skannal family recorded a partition agreement with respect to various properties. By way of the partition, Albert Cunyus Skannal, Jr. acquired from his siblings, including Charlie F. Skannal, the siblings' interests in certain Section 25 property. The parties to the partition agreed that the siblings' undivided interest in the minerals owned by them was not divided by the partition and would remain intact. This created a mineral servitude in favor of Charlie F. Skannal and others that is referred to as the 1968 Servitude.

After the 1968 partition, Albert Cunyus Skannal, Jr. owned the surface rights to all of the Section 25 land that is at issue in this motion. Upon the death of Albert and his wife, John C. Skannal, as sole heir, inherited all of that Section 25 property.

There were continuous oil and gas operations and production on Section 25 until 2004. Paul Strickland is an experienced oil and gas attorney who reviewed the title for Aethon in connection with this dispute. He concluded that the lack of production meant that the 1953 and 1968 Servitudes would (absent interruption) prescribe as a result of ten-

year nonuse in September of 2014. If that happened, the minerals rights would revert to the landowner.

In 1999, John C. Skannal conveyed to Sligo Hills, LLC all of his interest in all property owned by him in Section 25, subject to the reservation by John C. Skannal of all of his mineral rights. In 2005, John filed the first of three lawsuits against Sligo Hills and related parties based on allegations of fraud or misconduct; he sought to set aside the 1999 deed and a related mineral conveyance. John died during the litigation, but the Succession of John C. Skannal and Sligo Hills eventually settled the disputes.

The settlement included the execution of an Acknowledgment of Mineral Servitudes that was recorded in February 2012. Whether that acknowledgment interrupted the prescription of nonuse with respect to the mineral interests then owned by servitude co-owner Welcome Skannal Fawcett and now claimed by FTC is the issue presented by this motion. The Acknowledgment began by identifying the parties, stating that it was entered into for good and valuable consideration, and defining certain terms, including the 1953 Partition and the 1968 Partition. Sections of the Acknowledgment were dedicated to five servitudes, including the 1953 Servitude that was created by the 1953 Partition and the 1968 Servitude that was created by the 1968 Partition. The parties to this litigation agree that both of those servitudes were in effect in 2012 when the Acknowledgment was executed and recorded.

In the portion of the Acknowledgment dedicated to the 1953 Servitude, reference is made to the instrument that created the servitude and the legal description of the property affected. In relevant part, the Acknowledgment then provides:

> To the extent that the 1953 Servitude has not terminated and remains in effect with respect to any portion of the N½ of Section 25 that is owned by Sligo Hills or Sligo Enterprises, Sligo Hills and Sligo Enterprises hereby acknowledge the 1953 Servitude with the intention of Sligo Hills and Sligo Enterprises being to interrupt prescription of nonuse as to the 1953 Servitude insofar as it affects any portion of the N½ of Section 25 with respect to which the 1953 Servitude has not terminated; to this end, Sligo Hills and Sligo Enterprises acknowledge the right of the Succession to the 1953 Servitude as to the N½ of Section 25 to the extent that it has not previously terminated, specifically intending to interrupt prescription as provided by Louisiana Mineral Code articles 54 and 55 (Louisiana Revised Statutes 31:54-31:55).

The Acknowledgment includes a similar provision with respect to the 1968 Servitude, with the only difference being the date of the servitude at issue. Other servitudes, not relevant to this case, were also specifically identified and acknowledged.

The only parties to the 2012 Acknowledgment are Sligo Hills, LLC; Sligo Enterprises, Inc.; and the executor of the Succession of John C. Skannal. There were other co-owners of the servitudes at the time, including Welcome Skannal Fawcett and "various others."[1] The Acknowledgment did not mention any of those co-owners of the mineral servitudes.

FTC bases its stake to Section 25 minerals on a mineral deed recorded in November 2020 from David Fawcett and his wife Darcy Haber. David is the son of Welcome Skannal Fawcett, and the grandson of Charlie F. Skannal. Welcome Skannal Fawcett inherited property in the area in 1995 and left it to David per a 2021 judgment of possession. David's claim to mineral rights in Section 25 were dependent on the continued existence of the 1953 and 1968 Servitudes.

---

[1] Declaration of Paul A. Strickland, Doc. 28-8, ¶ 6.

David Fawcett and Darcy Haber conveyed to FTC all of their undivided right to minerals associated with certain tracts described in the 2020 mineral deed. The description included all of Section 25 (and some other sections), with it being the intent of the grantors to convey unto FTC all of their right to any minerals or related rights associated with Section 25 and the other properties described in the mineral deed.

**Analysis**

Louisiana law governs this case, which was removed to federal court based on diversity jurisdiction. The court must make an "Erie guess" as to how the state supreme court would decide the issue. Coleman E. Adler & Sons, L.L.C. v. Axis Surplus Ins. Co., 49 F.4th 894, 897 (5th Cir. 2022). "In making an Erie guess, we employ Louisiana's civilian methodology and first examine primary sources of law: the constitution, codes, and statutes." Dow Constr., L.L.C v. B P X Operating Co., 140 F.4th 246, 250 (5th Cir. 2025).

The primary source of law relevant to this dispute is the Louisiana Mineral Code. It provides that a mineral servitude is extinguished by prescription resulting from nonuse for ten years. La. R.S. 31:27. The Code also provides for various ways that the prescription of nonuse may be interrupted, including by the production of minerals covered by the act that created the servitude. La. R.S. 31:36. The prescription of nonuse may also be interrupted by an acknowledgment from the landowner.

The Mineral Code has two statutes that govern acknowledgments. They provide:

> R.S. 31:54 - Interruption of prescription by acknowledgment; formal requirements
>
> The prescription of nonuse may be interrupted by a gratuitous or onerous acknowledgment by the owner of the land burdened by a mineral servitude. An acknowledgment must be in writing, and, to affect third parties, must be filed for registry.
>
> R.S. 31:55 - Express intent required
>
> An acknowledgment must express the intent of the landowner to interrupt prescription and clearly identify the party making it and the mineral servitude or servitudes acknowledged.

The 2012 Acknowledgment was executed by the owner of the land burdened by the two servitudes, it was in writing, and it was filed for registry. Thus, it satisfied the requirements of Section 54. The 2012 Acknowledgment expressed the intent of the landowner (Sligo) to interrupt prescription, clearly identified the party making it (Sligo), and clearly identified the two servitudes at issue (the 1953 and 1968 Servitudes) that were among the servitudes acknowledged. Thus, it also satisfied the requirements of Section 55.

Aethon argues that the phrasing of the Acknowledgment, aside from the legal issues discussed below, makes it ineffective to interrupt prescription as to any owner other than the Succession of John C. Skannal. The relevant provision states that the landowner parties "hereby acknowledge the 1953 Servitude with the intention of Sligo Hills and Sligo Enterprises being to interrupt prescription of nonuse as to the 1953 Servitude …; to this end, Sligo Hills and Sligo Enterprises acknowledge the right of the Succession to the 1953 Servitude as to the N½ of Section 25 to the extent that it has not previously terminated, specifically intending to interrupt prescription as provided by Louisiana Mineral Code

articles 54 and 55 (Louisiana Revised Statutes 31:54-31:55)." A similar declaration is made with respect to the 1968 Servitude.

The passage begins with the unambiguous and broad statement that the landowner parties "hereby acknowledge the 1953 (and 1968) Servitude with the intention of [the landowner] being to interrupt prescription of nonuse as to the 1953 (and 1968) Servitude." Aethon argues that the effect of the Acknowledgment is limited by the next phrase that states "to this end" the landowners acknowledge "right of the Succession" to the servitudes.

"When the parties intend a contract of general scope but, to eliminate doubt, include a provision that describes a specific situation, interpretation must not restrict the scope of the contract to that situation alone." La. Civ. Code art. 2052. Considering that principle, the applicable Mineral Code articles, and the contract as a whole, the court finds the better reading of the instrument is that the servitudes are acknowledged by the unambiguous and broad first statement. The "to this end" phrase is a "belt and suspenders" reassurance to the settling Succession that this acknowledgment benefits it. If the intent was to somehow limit the Acknowledgment to the right of the Succession, the document could have simply omitted the first, broad phrase. Also, mineral servitudes are generally not divisible, so the transfer of a portion of an owner's interest in a servitude does not create separate servitudes held by individual co-owners (so that each servitude would require a separate acknowledgment); it results in multiple co-owners of a single servitude. La. R.S. 31:62[2]

---

[2] "Except as provided in Articles 63 through 71, the rights and obligations of the owner of a mineral servitude are indivisible." La. R.S. 31:62.

& 69[3]. This mineral servitude had multiple co-owners, the servitude was acknowledged, and that benefitted each co-owner.

Aethon nonetheless argues that the Acknowledgment did not interrupt prescription with respect to the interests claimed by FTC (through David Fawcett and Darcy Haber) because no co-owners of the mineral servitudes other than Succession of Skannal were parties to the Acknowledgment or specifically identified in it. Aethon argues that the comments to Articles 54 and 55 and certain Louisiana court decisions issued before the enactment of the Mineral Code (effective January 1, 1975) require that an acknowledgment include a specific reference to each person who may own an interest in a servitude if that interest is to be interrupted.

Aethon's argument is similar to one it made in B. A. Kelly Land Co., L.L.C. v. Aethon Energy Operating, L.L.C., 25 F.4th 369 (5th Cir. 2022) that a demand letter under the Well Cost Reporting Statute had to include certain information that was lacking. The district court accepted Aethon's argument, but the Fifth Circuit reversed because the demand letter satisfied the express requirements of the statute, and Aethon was attempting to "erroneously engraft[] conditions into §§ 103.1 and 103.2 that are not present in the text of the statutes themselves." Id. at 374.

Aethon's argument here also attempts to engraft an additional requirement onto the quite specific statutes governing acknowledgments. There is nothing in the text of either

---

[3] "The conveyance or reservation by a mineral servitude owner of a portion of his rights does not divide the mineral servitude but creates only a co-ownership, except that if a person other than the servitude owner acquires all of the rights granted by the act creating the servitude in a specific geographical area, the servitude is divided." La. R.S. 31:69.

statute that requires that each servitude co-owner be a party to or identified in an acknowledgment for the acknowledgment to be effective as to their interest or the interests of their successors or assigns. Aethon has not cited any Louisiana or federal decision that has squarely held that Articles 54 and 55 include such a requirement. If the legislature had intended that each co-owner of a servitude be named in an acknowledgment for it to be effective as to that co-owner's interest, it could have easily added such a requirement to the statutes. It did not.

Aethon argues that, despite the plain language of the statutes, the additional requirement it advocates is mandated by the comments to the Mineral Code articles and pre-Code decisions cited in those comments. The Louisiana Supreme Court, in a case that required interpretation of a Mineral Code article, said: "While statements contained in the official comments are not part of the statute and are not binding on courts, they are not discounted entirely, and we find that they provide some aid in interpreting legislative intent." Broussard v. Hilcorp Energy Co., 24 So.3d 813, 817 n.5 (La. 2009).

Aethon points to the comment to Article 54 that begins by discussing that there is no requirement that there be "consideration" for a valid acknowledgment of a mineral servitude. The comment states that the law has evolved without any such requirement "but it has compensated for this by the development of a rigid set of formal rules intended to assure that a landowner is fully aware of and clearly intends the legal consequences of his act in acknowledging outstanding mineral rights." The comment continues by stating that the observance of these formalities is sufficient to give full evidence of the landowner's intent and to warrant legal enforcement even in the absence of consideration. The comment

Page **10** of **18**

concludes: "Article 54 and the succeeding articles dealing with acknowledgments are essentially a preservation of the established law."

Nothing in the comment to Article 54 describes the kind of requirement urged by Aethon, but Aethon latches on to the statement that the Mineral Code articles dealing with acknowledgments are "essentially a preservation of the established law" to urge that cases cited in the comment to Article 55 support its argument and must be followed. The comment to Article 55 states that the article combines rules that evolved in several cases. Among those rules is the requirement that the landowner's intent must be express and certain, the instrument must have been made for that purpose, and the instrument must adequately describe the property to which it is to apply.

> Aethon particularly embraces the following passage from the comment:
>
> Additional requirements grew out of <u>Arkansas La. Gas Co. v. Thompson</u>, 222 La. 868, 64 So.2d 202 (1953) and <u>Roberts v. Cooper</u>, 127 So.2d 369 (La.App.2d Cir. 1961), which involved attempted acknowledgments in unitization agreements. The efforts at acknowledgments in these two cases failed, not because the intent to acknowledge was not expressed, but because it was not related to **each interest which each landowner intended to affect** by execution of the agreement and because of inadequacy in description of the interests in question and the lands burdened. These cases vividly illustrate the difficulty of securing acknowledgments in multilateral transactions involving several tracts of land and multiple mineral servitude interests. Although a less formal approach might be helpful to the draftsman of conveyances and contracts, it was considered needlessly unsettling to the law to change the established standards. The requirements stated in Article 55 are those that presently exist, though restated in simpler form. (Emphasis added.)

There is language in the comment from which one might infer that the requirement that the landowner acknowledge "each interest" means that each co-owner of the servitude must be identified in the acknowledgment, but the argued acknowledgements in the <u>Arkansas</u>

Louisiana Gas and Roberts pooling agreements failed for multiple reasons, and those cases do not expressly hold that an acknowledgment must include the identification of each co-owner of each servitude at issue. Notably, the "multiple mineral servitude interests" at issue in those cases were multiple, separate servitudes that affected the pooled land, each of which had to be acknowledged, not multiple owners of one servitude.

The Arkansas Louisiana Gas case arose when the gas company filed a declaratory judgment action based on its claim to be the owner of a valid mineral lease covering 140 acres in the Ruston Gas Field. The Thompson family claimed to own the same mineral rights. Mr. Thompson had owned the property, but he sold it to Mr. Gibson it with a reservation of mineral rights, thus giving rise to a mineral servitude in Thompson's favor. About 20 years later, Mr. Gibson considered himself to be the owner of the minerals by virtue of the prescription of nonuse, and he (and others who he had leased to) granted mineral leases to Arkansas Louisiana Gas ("ALG").

In 1943, ALG decided to pool a 640-acre unit that included the 140-acre tract involved. ALG's title research discovered the possibility that the Thompsons still had a mineral interest in the property, so ALG acquired a mineral lease from the Thompsons. It was determined that the Thompsons were the owners of mineral rights on the 140-acre tract in 1943, but those rights would prescribe in March 1944 unless prescription was interrupted or acknowledged by the landowner, Gibson. It was argued in favor of the Thompsons' interest that Gibson acknowledged the rights of the Thompsons when he signed the ALG pooling agreement that stated it was the intent of each of the parties to acknowledge the

ownership of each to their respective interests "so as to interrupt the running of the liberative prescription of non-use."

The Supreme Court held that the pooling agreement was not sufficient to constitute an acknowledgment by Gibson of the Thompsons' mineral interest. The holding was based on a lack of sufficient evidence of Gibson's intent. The Court looked to the provisions of the Civil Code (which alone governed mineral rights prior to the Mineral Code), including the requirements that there be at least two parties to a contract and that the consent/intent of the parties clearly appear. The Court found that it was "clear that there was no privity of contract between Gibson and the Thompsons." That was because Gibson and all known interested parties had signed the pooling agreement before it was determined that the Thompsons may have a relevant mineral interest. After that possibility was discovered, ALG obtained a two-year lease from the Thompsons and then had the Thompsons sign a counterpart of the pooling agreement that had already been signed by Gibson and his mineral transferees "several weeks" earlier.

Critically, the instrument signed by landowner Gibson did not identify the Thompsons or any of the other parties who would sign the agreement, and it generally referred to the participants as "mineral owners." When the Thompsons signed weeks later, Gibson had no knowledge of their participation in the pooling agreement. The Court also faulted the agreement (insofar as it could serve as an acknowledgment) because it "described the property as a unit—without specific description of the several tracts composing same or in any manner identifying the servitudes bearing on the several tracts." Arkansas Louisiana Gas, 222 La. at 892. It then noted a requirement of the then-applicable

Civil Code that the acknowledgment must be "of the right of the person whose title the debtor or possessor prescribes." Id.  For these reasons, the Court found that the servitude created under the deed from Thompson to Gibson was extinguished because the pooling agreement did not constitute an acknowledgment of that servitude.

The Court relied on the general Civil Code provisions then in effect for acknowledgment of any kind of prescription, and Civil Code article 3520 at the time referred to the acknowledgment being of the right "of the person" whose title was at issue. Aethon points to this language to support its argument, but in the same paragraph where the Court discussed article 3520, it described the (then) requirements of an acknowledgment: It must be "specific, clear, and concise," and it must "adequately describe the property to which it applies" and "sufficiently identify the servitude as to which acknowledgment is sought to be made." Id. at 892.  The Court did not say that all co-owners of a mineral servitude had to be named to have their rights acknowledged.  An important distinction from this case is that the Thompsons were not co-owners of a servitude that was otherwise acknowledged; they were the owners of their own servitude that was one of several servitudes and leases that were subject to the pooling agreement, and their servitude was not mentioned in the document when the landowner signed it.

The decision in Roberts v. Cooper, 127 So.2d 369 (La. App. 2d Cir. 1961) applied the Arkansas Louisiana Gas decision to a similar situation in which a pooling agreement, signed in counterparts, included an acknowledgment so as to interrupt prescription of nonuse.  The appellate court's summary of what it found to be the requirements of an acknowledgment included the specific identification of the parties designated in the

Page **14** of **18**

agreement as mineral owners, as well as the identification of the servitudes and the description of the tracts in the unit. Accordingly, a pooling agreement similar to that at issue in the Arkansas Louisiana Gas case was not a valid acknowledgment.

There is some language in Arkansas Louisiana Gas and Roberts to support Aethon's contention that, prior to enactment of the Mineral Code, an acknowledgment (at least if it was a pooling agreement) include an identification of the parties designated as mineral owners. But those decisions did not hold that the lack of such a listing was alone fatal to another form of acknowledgment that clearly expressed the landowner's intent and identified the servitude at issue.

Undermining Aethon's argument is a pre-Mineral Code Supreme Court decision that upheld an acknowledgment despite no specific naming of the servitude co-owners. In James v. Noble, 214 La. 196 (La. 1948), the landowner executed a mineral conveyance to J.M. Nabors, who later died. After Nabors' death, the landowner acknowledged that 1/4 of the mineral rights "under the above described tract of land is presently vested in the heirs, legatees and successors in title of the said J. M. Nabors and Mrs. Mary Lee Nabors, his wife, both deceased, and does hereby renew and continue the rights of said persons which are derived by virtue of the original conveyance of mineral rights dated July 22, 1916, above referred to."

There is no indication that any of the then living co-owners of the servitude were listed by name, but the land and servitude at issue were clearly described in the acknowledgement. The Court reviewed the caselaw and determined that "the legal requirement for an acknowdgment sufficient to interrupt ten years prescription for

nonuser (sic) of a mineral servitude must be expressed and certain, must have been made for that purpose and must adequately describe the property to which it applies." Id. at 202. "The acknowledgment in the present case was by authentic act and was made for the expressed purpose of interrupting prescription and the property was adequately described," so it was a valid acknowledgment. Id.

This case does not address a pooling agreement governing multiple servitudes that was signed in counterparts. It concerns an acknowledgment that was executed after the enactment of the Mineral Code, which specifically set forth the applicable requirements for an acknowledgment. Those requirements do not include the identification of each person who owns a percentage of the servitude at issue. There is not even a requirement that there be two parties to a modern acknowledgment. The legislation contemplates that it can be executed by the owner alone, which was not the case when Arkansas Louisiana Gas was explaining that there must be two parties to every contract and noting that there was no privity between Mr. Gibson and the Thompsons.

"When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. Civ. Code. art. 2. The acknowledgment that Articles 54 and 55 of the Mineral Code describe is simple. It has to be in writing by the clearly identified landowner, express the intent of the landowner to interrupt prescription, clearly identify "the mineral servitude or servitudes acknowledged," and be recorded (to affect third parties). That's it. There is no requirement that every co-owner of the mineral servitude be a party to or named in the acknowledgment.

Aethon urges policy reasons that would favor the requirement they suggest, but it was also reasonable for the legislature to decline to include the additional and potentially burdensome requirement urged by Aethon. It could be an onerous task for the landowner to have to list every person who is a co-owner of a mineral servitude (if the landowner wishes to interrupt prescription as to their rights under the servitude) rather than just clearly identify the servitude as required by Article 55.

By the time of an acknowledgment, often executed several years or decades after the creation of the servitude at issue, determining all of the various persons claiming ownership of a percentage of a servitude could require extensive title and succession research that will often identify multiple persons who would have to be listed in the acknowledgment. That's a major requirement to divine from nonbinding comments and interpretations of pre-Code jurisprudence. It would also add to the complexity faced by future title examiners to determine, as to the many persons who then claim an ownership interest in a servitude, whether or not prescription was acknowledged as to each of their predecessors in title. And it would be terribly unfair to persons who follow the requirements of the Mineral Code articles to a tee to impose a jurisprudentially created additional requirement that they could not have easily anticipated.

**Conclusion**

The scheme set forth in the Mineral Code contemplates prescription being interrupted with respect to a clearly identified servitude, not with respect to each particular person who is identified as a co-owner of the servitude at the time of the acknowledgment. **FTC's Motion for Partial Summary Judgment on Acknowledgment (Doc. 33)** is

**granted**. The court holds that the 2012 Acknowledgment was valid to interrupt the prescription of nonuse with respect to FTC's interests flowing from the 1953 Servitude and the 1968 Servitude.

The court will address Aethon's motions for summary judgment on the Well Cost Reporting Statute in due course. If FTC can both survive those motions and prevail on the merits under the procedures described in cases such as B. A. Kelly Land Co., L.L.C. v. Aethon Energy Operating, L.L.C., 25 F.4th 369 (5th Cir. 2022), it will not need to contribute to the costs of drilling operations for the period covered by deficient or failed reporting.[4] XXI Oil & Gas, LLC v. Hilcorp Energy Company, 206 So.3d 885, 890 (La. App. 3d Cir. 2016), writ denied, 216 So.3d 814 (La. 2017).[5] At any point where Aethon is found to have cured any lack of compliance with the reporting requirements, it would no longer be penalized and could resume deducting FTC's costs. M&N Res. Mgmt., LLC v. Exco Operating Co., LP, 2017 WL 8809775, *6 (W.D. La. 2017) (Hornsby, M.J.).

THUS DONE AND SIGNED in Shreveport, Louisiana, this the 28th day of August, 2025.

Mark L. Hornsby
U.S. Magistrate Judge

---

[4] The Fifth Circuit recently clarified that post-production costs are included within Section 103.2's forfeiture provision. Dow Constr., L.L.C v. B P X Operating Co., 140 F.4th 246 (5th Cir. 2025).

[5] XXI Oil stated: "We agree with the federal court's interpretation in Brannon Properties, LLC v. Chesapeake Operating, Inc., 514 Fed. Appx. 459 (5th Cir. 2013), that the owners would not need to contribute to the costs of drilling operations for the period covered by deficient or failed reporting. Once the operator or producer complies with the statutory requirement, it would no longer be penalized and could start deducting for the costs."